UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| FONDA WICKS, | § |
| | § |
|   Plaintiff, | § |
| | § |
| v. | §   Civil Action No. 4:21-CV-1275-O |
| | § |
| METROPOLITAN LIFE INSURANCE | § |
| COMPANY, | § |
| | § |
|   Defendant. | § |

## MEMORANDUM OPINION & ORDER

Before the Court are Plaintiff Fonda Wicks' ("Mrs. Wicks") Motion for Summary Judgment and Brief in Support (ECF Nos. 40–41), filed September 14, 2022; Plaintiff's Appendix in Support, filed October 3, 2022; Defendant Metropolitan Life Insurance Company's ("MetLife") Response and Cross-Motion for Summary Judgment, Brief in Support, and Appendix in Support (ECF Nos. 47–49), filed October 21, 2022; Plaintiff's Reply to Defendant's Response to the Original Motion (ECF No. 50), filed November 5, 2022; Plaintiff's Response to Defendant's Cross-Motion and Brief in Support (ECF Nos. 51–52), filed November 11, 2022; and Defendant's Reply (ECF No. 53), filed November 18, 2022. Having reviewed the motions, briefing, and applicable law, the Court finds that a motion for summary judgment is not the appropriate vehicle for resolution of this case due to the prevalence of disputed issues of fact. Instead, the Court must conduct a *de novo* review of the administrative record to determine whether MetLife correctly concluded that Mrs. Wicks failed to show that an accident was the direct and sole cause of her late husband Jackie Wicks' ("Mr. Wicks") death.

Accordingly, the Court **DENIES** Mrs. Wicks' Motion for Summary Judgment and MetLife's Cross-Motion for Summary Judgment. Based on an independent review of the

administrative record, the Court concludes Mrs. Wicks has not carried her burden of establishing that she is entitled to accidental death benefits based on the terms of her life insurance plan and the facts in the administrative record. Thus, the Court **AFFIRMS** MetLife's denial of benefits.

I.  **BACKGROUND**[1]

Decedent Jackie Wicks participated in the COG Operating LLC Welfare Benefit Plan (the "Plan") as a company employee.[2] Under the Plan, Mr. Wicks enrolled in basic life insurance, accidental death and dismemberment, and voluntary accidental death and dismemberment coverage.[3] Plaintiff Fonda Wicks' ("Mrs. Wicks"), decedent's widow, is the sole beneficiary of the life insurance policy held by Defendant Metropolitan Life Insurance Company ("MetLife").[4]

**A. Facts about Decedent Jackie Wicks' Surgery, Hospitalization, and Death**

On June 24, 2021, Jackie Wicks underwent an elective laparoscopic sleeve gastrectomy, commonly known as gastric sleeve surgery, at Lake Granbury Medical Center.[5] Mr. Wicks weighed nearly 300 pounds and underwent surgery to improve his weight and health.

During Mr. Wicks' recovery phase, his surgeon, Dr. Todd Belott, issued several orders for post-surgery pain medication.[6] One such order prescribed Mr. Wicks morphine and fentanyl based on his pain levels as part of routine recovery from anesthesia.[7] Another order prescribed one milligram of hydromorphone (brand name "Dilaudid"), by IV every two hours, as needed for severe pain once out of recovery.[8] Pursuant to the anesthesia order, Mr. Wicks received fifty

---

[1] All undisputed facts—including the Administrative Record citations—come from Defendant's Cross-Motion for Summary Judgment unless specified otherwise. *See* Def.'s Cross-Motion, ECF No. 48.
[2] Def.'s Answer 2, ECF No. 34.
[3] Administrative Record ("A.R.") at 173, 416, ECF No. 42.
[4] Pl.'s First Am. Compl. 2, ECF No. 14.
[5] A.R. at 405, 410, 453–455, ECF No. 42.
[6] A.R. at 453–457, 513, ECF No. 42.
[7] A.R. at 457, ECF No. 42.
[8] A.R. at 513, ECF No. 42.

micrograms of fentanyl at 11:06 a.m. and 11:12 a.m., and Mr. Wicks received four milligrams of morphine at 11:20 a.m.[9]

At approximately 12:30 p.m., the hospital transferred Mr. Wicks out of recovery and to a hospital room, accompanied by Plaintiff.[10] Just before 1:00 p.m., Mr. Wicks ambulated around the hallway with assistance but complained of pain—for which he received one milligram of Dilaudid.[11] Plaintiff left the room for lunch and returned to find Mr. Wicks unresponsive and not breathing.[12] At 1:38 p.m., the hospital initiated life-saving procedures.[13] Mr. Wicks received two milligrams of Narcan at 1:40 p.m., but it had no effect.[14] The hospital moved Mr. Wicks to the ICU, but he never regained consciousness.[15] Two days later, on June 26, 2021, Mr. Wicks died.[16]

Dr. Tara Pavelek, one of Mr. Wicks' physicians in the ICU, pronounced Mr. Wicks dead and prepared the Death Certificate.[17] Dr. Pavelek ruled the Manner of Death as "Natural" and the Immediate Cause of Death as "Anoxic Brain Injury" as a result of "Cardiac Arrest" and "Aspiration of Gastric Contents," with the Underlying Cause of "Unintentional Narcotic Overdose."[18] Dr. Pavelek also listed "Morbid Obesity" and "Severe Obstructive Sleep Apnea" as "Significant Conditions Contributing to the Death But Not Resulting in the Underlying Cause of Death."[19]

Dr. Rena Zheng wrote a report noting that Mr. Wicks suffered an anoxic brain injury and that "[h]is cause of death was documented as an unintentional narcotic overdose, causing gastric

---

[9] A.R. at 527, ECF No. 42.
[10] A.R. at 366, 848, ECF No. 42.
[11] A.R. at 245, 366, 407, 679, 953, ECF No. 42.
[12] A.R. at 235, 679, ECF No. 42.
[13] A.R. at 235–36, ECF No. 42.
[14] A.R. at 235, ECF No. 42.
[15] A.R. at 262, ECF No. 42.
[16] A.R. at 209, ECF No. 42.
[17] A.R. at 209, 450, ECF No. 42.
[18] A.R. at 209, ECF No. 42.
[19] A.R. at 209, ECF No. 42.

aspiration, cardiac arrest, and anoxic brain injury."[20] Also, on July 5, 2021, Dr. Paul Radelat's autopsy report listed the death as an anoxic episode and did not speak to the underlying cause.[21]

### B. Facts about the Plan

This suit involves two coverages under the Plan: Accidental Death and Dismemberment coverage and Voluntary Accidental Death and Dismemberment coverage. The relevant insurance provisions from these coverages are identical and provide:

> If You or a Dependent sustain an accidental injury that is the Direct and Sole Cause of a Covered Loss described in the SCHEDULE OF BENEFITS, Proof of the accidental injury and the Covered Loss must be sent to [MetLife]. When We receive such Proof We will review the claim. If We approve the claim, We will pay the insurance in effect on the date of the injury within 60 days of Our receipt of such proof.
>
> **Direct and Sole Cause** means that the Covered Loss occurs within 12 months of the date of the accidental injury and was a direct result of the accidental injury, independent of other causes.[22]

Under the Plan, "Proof" means written evidence, satisfactory to MetLife, that the conditions and requirements for payment of any benefit described in the Plan have been met, and "Covered Loss" refers to a death.[23] The plan does not define "accident."[24]

Additionally, for both coverages, the Plan has two potentially relevant exclusion provisions.[25] First, Exclusion 1 (also called the "Illness/Treatment Exclusion") states that benefits will not be paid "for any loss caused or contributed to by: 1. physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity."[26] Second, Exclusion 8 (also called the

---

[20] A.R. at 635, ECF No. 42.
[21] A.R. at 628, ECF No. 42.
[22] A.R. at 48, 130, ECF No. 42.
[23] A.R. at 34, 100, ECF No. 42.
[24] Pl.'s Br. 10–11, ECF No. 41.
[25] A.R. at 48–49, 130–31, ECF No. 42.
[26] A.R. at 48, 130, ECF No. 42.

"Drug Exclusion") states, in relevant part, that no benefits will be paid "for any loss caused or contributed to by: . . . 8. the voluntary intake or use by any means of any drug, medication or sedative, unless it is: taken or used as prescribed by a Physician."[27]

### C. Procedural History

After Mr. Wicks' death, Plaintiff made a claim for the basic life insurance benefits payable under the Plan.[28] In July 2021, MetLife paid the basic life insurance benefits to Plaintiff as the named beneficiary.[29] Subsequently, Plaintiff contacted MetLife about the accidental death and voluntary accidental death benefits under the Plan.[30] Plaintiff had not yet made an official claim for accidental death and voluntary accidental death benefits at that point.[31] On July 28, 2021, MetLife advised Plaintiff that no accidental death claim existed based on the Death Certificate's classification of Mr. Wicks' death as "Natural."[32] Then, on October 7, 2021, Plaintiff filed this lawsuit in state court and MetLife timely removed the action to this Court on November 17, 2021.[33]

Because Plaintiff had not exhausted the Plan's administrative remedies for her accidental death and voluntary accidental death claims (the "AD&D claim"),[34] the Court stayed this case on November 24, 2021, pending the administrative review of Plaintiff's AD&D claim.[35] To exhaust her administrative remedies, Plaintiff had to (1) submit her AD&D claim to MetLife, (2) receive

---

[27] A.R. at 48–49, 130–31, ECF No. 42.
[28] A.R. at 151, ECF No. 42.
[29] A.R. at 166–68, ECF No. 42.
[30] A.R. at 166, ECF No. 42.
[31] A.R. at 166, ECF No. 42.
[32] A.R. at 166, ECF No. 42.
[33] *See* Notice of Removal, ECF No. 1.
[34] Plaintiff's claims for the accidental death benefits and the voluntary accidental death benefits will hereinafter collectively be referred to as the "AD&D claim." Plaintiff states in her Brief that she seeks to recover only "under the Voluntary Accidental Death and Dismemberment Insurance policy (the 'Plan')." *See* Pl.'s Br. 4, ECF No. 41. "The relevant terms are the same for the accidental death coverage and the voluntary accidental death coverage." Def.'s Cross-Motion 5 n.2, ECF No. 48. So, if coverage exists under the voluntary accidental death part of the Plan, it also exists under the accidental death part of the Plan.
[35] *See* Order to Stay 1, ECF No. 8.

MetLife's original claim investigation findings, (3) submit her administrative appeal of the findings to MetLife, and (4) receive MetLife's final decision. So, Plaintiff first submitted her AD&D claim to MetLife along with the following documents: a letter,[36] medical records from Lake Granbury Medical Center,[37] an Expert Institute Clinical Report from Dr. Rena Zheng,[38] the Death Certificate completed by Dr. Pavelek,[39] FDA labels for fentanyl, Dilaudid, and morphine,[40] an autopsy report prepared by Dr. Paul Radelet,[41] excerpts from the Plan,[42] and claim information submitted to MetLife by COG Operating LLC.[43]

Upon first review, MetLife denied Plaintiff's AD&D claim via a letter dated March 9, 2022.[44] In this letter, MetLife restated the Direct and Sole Cause provision and the Illness/Treatment Exclusion, and then restated the Death Certificate's findings regarding Manner of Death, Immediate Cause of Death, Underlying Cause of Death, and Significant Conditions Contributing to Death.[45] MetLife stated that Mr. Wicks' death did not result directly and solely from an accidental injury and therefore said it found no evidence of an accident independent of other causes.[46] Consequently, MetLife determined that Mr. Wicks' death was not a Covered Loss.[47] MetLife further stated that "[e]ven if an accident independent of other causes had occurred, which is not proven by the documents, the Plan excludes as a Covered Loss any loss caused or contributed

---

[36] A.R. at 637–41, ECF No. 42.
[37] A.R. at 211–412, 420–602, ECF No. 42.
[38] A.R. at 634–36, ECF No. 42.
[39] A.R. at 209, 419, ECF No. 42.
[40] A.R. at 603–25, ECF No. 42.
[41] A.R. at 628–33, ECF No. 42.
[42] A.R. at 626–27, ECF No. 42.
[43] A.R. at 205–07, 415–17, ECF No. 42; *See also* Def.'s Cross-Motion 5, ECF No. 48.
[44] A.R. at 652–54, ECF No. 42.
[45] A.R. at 652–54, ECF No. 42.
[46] A.R. at 652–54, ECF No. 42.
[47] A.R. at 652–54, ECF No. 42.

to by physical illness or infirmity, or the diagnosis or treatment of such illness or infirmity."[48] For these reasons, MetLife denied Plaintiff's claim and advised her of her right to an administrative appeal.[49]

MetLife then received Plaintiff's AD&D claim appeal (step three of the above process) on May 18, 2022.[50] In support of her appeal, Plaintiff submitted the same medical records, autopsy report, expert reports, and Death Certificate from her initial claim.[51] Plaintiff also submitted a Certificate of Insurance, MetLife's denial letter regarding the initial claim, and an affidavit from Plaintiff.[52]

Plaintiff contended on appeal that Mr. Wicks died due to a negligent overdose of prescription medications.[53] In her briefing, Plaintiff asserts, "The nurses in fact did not monitor closely Mr. Wicks upon the initiation of the Dilaudid regimen. . . . Plaintiff had left Mr. Wicks for about 25 minutes unattended as she grabbed lunch at the hospital cafeteria, trusting the nurses would watch him. To her surprise, she returned to find Mr. Wicks blue and not breathing."[54] Plaintiff does not introduce any competent expert medical testimony to this effect.[55]

In conducting its appellate review, MetLife had Dr. Michael Darracq, an independent Medical Toxicology specialist, review the medical documentation submitted by Plaintiff on July 7, 2022.[56] Dr. Darracq stated that he could not conclude with a reasonable degree of medical certainty that an administered drug overdose caused Mr. Wicks' death.[57] Dr. Darracq wrote that

---

[48] A.R. at 652–54, ECF No. 42.
[49] A.R. at 652–54, ECF No. 42.
[50] A.R. at 161, ECF No. 42.
[51] A.R. at 676, 781–1214, ECF No. 42.
[52] A.R. at 672–74, 679–81, 683–779, ECF No. 42.
[53] A.R. at 1240, ECF No. 42.
[54] Pl.'s Br. 5, ECF No. 41.
[55] *See* Pl.'s Br., ECF No. 41; Pl.'s Reply, ECF No. 50; *and* Pl.'s Response Br., ECF No. 52.
[56] A.R. at 1240, ECF No. 42; *see* A.R. at 1232–33, ECF No. 42.
[57] A.R. at 1232, ECF No. 42.

"[t]he dose of Dilaudid administered was an appropriate and accepted dose for pain relief following surgery."[58] Furthermore, he wrote that "the timing was not that which would be expected with opioid related death."[59] Dr. Darracq also stated that Mr. Wicks "had the physical illness of obesity."[60] He further remarked, "In the absence of this condition and the surgery that was performed to correct it, the decedent would not have received postoperative medications that may have been contributory to death. Therefore, the loss was contributed to by the physical illness of obesity and the surgical treatment of same."[61]

In a letter dated July 13, 2022, MetLife upheld its denial of Plaintiff's AD&D claim.[62] First, MetLife restated the Direct and Sole Cause provision, the Illness/Treatment Exclusion, and the Death Certificate language.[63] Second, MetLife determined that Mr. Wicks' death was not a Covered Loss "because it did not directly and solely result from an accidental injury."[64] Third, MetLife stated that even if Mr. Wicks' death had been an accident, "Accidental Death benefits are still not payable because the illness/treatment exclusion applies."[65] At this point, Plaintiff had exhausted her administrative remedies.

Accordingly, the parties filed a joint status report requesting the Court vacate its stay, which the Court granted on July 14, 2022.[66] On September 14, 2022, Plaintiff filed her Motion for Summary Judgment and Brief in Support, and added her Appendix in Support on October 3, 2022.[67] On October 21, 2022, Defendant filed its Response and Cross-Motion for Summary

---

[58] A.R. at 1233, ECF No. 42.
[59] A.R. at 1232, ECF No. 42.
[60] A.R. at 1232, ECF No. 42.
[61] A.R. at 1232, ECF No. 42.
[62] A.R. at 1239–41, ECF No. 42.
[63] A.R. at 1239–41, ECF No. 42.
[64] A.R. at 1239–41, ECF No. 42.
[65] A.R. at 1239–41, ECF No. 42.
[66] *See* Order to Vacate Stay, ECF No. 13.
[67] *See* ECF Nos. 40–42.

Judgment, Brief in Support, and Appendix in Support.[68] On November 5, 2022, Plaintiff filed her Reply to Defendant's Response to the Original Motion.[69] Plaintiff then filed her Response to Defendant's Cross-Motion and Brief in Support on November 11, 2022.[70] Finally, Defendant filed its Reply to Plaintiff's Response on November 18, 2022.[71] Both parties' motions are now ripe for the Court's review.

## II.   LEGAL STANDARDS

### A.  Summary Judgment and Rule 52 Standards

The Court may grant summary judgment where the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(a). When presented with cross-motions for summary judgment, the Court must review and evaluate each motion separately and independently, viewing the evidence and inferences in the light most favorable to the non-moving party in each instance. *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014). The Court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, if support appears to exist for disputed allegations such that "reasonable minds could differ as to the import of the evidence," the Court must deny the motion. *Id.* at 250.

Often in the context of an ERISA claim, "using Rule 52 is effective . . . because courts may resolve factual disputes and issue legal findings without the parties resorting to cross motions for summary judgment." *Pike v. Hartford Life & Accident Ins. Co.*, 368 F. Supp. 3d 1018, 1025 (E.D. Tex. 2019)). Thus, when a genuine issue of a material fact exists in an ERISA-benefit case that

---

[68] *See* ECF Nos. 47–49.
[69] *See* ECF No. 50.
[70] *See* ECF Nos. 51–52.
[71] *See* ECF No. 53.

renders summary judgment inappropriate, the Court may review the administrative record and make findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a). *See Koch* v. *Metro. Life Ins. Co.*, 425 F. Supp. 3d 741, 747 (N.D. Tex. 2019) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999)). The Fifth Circuit leaves the "exact procedures to the district court's sound discretion." *See Katherine P. v. Humana Health Plan, Inc.*, 959 F.3d 206, 209–10 (5th Cir. 2020). On appellate review, the district court's factual findings under Rule 52 will not be set aside unless they are clearly erroneous. FED. R. CIV. P. 52(a)(6); *Newsome v. Reliance Standard Life Ins. Co.*, 26 F.4th 329, 334 (5th Cir. 2022).

Adopting this approach and having reviewed the motions, briefing, and applicable law, the Court finds that a motion for summary judgment is not the appropriate vehicle for resolution of this case due to the prevalence of disputed issues of fact. Instead, the Court must conduct a *de novo* review of the administrative record to determine whether MetLife correctly concluded that Mrs. Wicks failed to show that an accident was the direct and sole cause of her late husband, Jackie Wicks' death. Indeed, both parties consent to judgment on the administrative record.[72] Accordingly, the Court **DENIES** Plaintiff Fonda Wicks' Motion for Summary Judgment and **DENIES** Defendant MetLife's Cross-Motion for Summary Judgment and proceeds to conduct an independent review of the administrative record.

### B. ERISA Standard of Review

ERISA provides federal courts with jurisdiction to review benefit determinations. *See* 29 U.S.C. § 1132(a)(1)(B); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112–13 (1989). Before reviewing the record, the Court must determine whether the Plan's discretionary clause

---

[72] *See* Joint Scheduling Order 1, ECF No. 15-1 (Ex. A). Previously, when parties consent to resolution of their dispute via a specific procedural vehicle, the Fifth Circuit has not reached the question of whether their chosen vehicle is appropriate. *Katherine P. v. Humana Health Plan, Inc*., 959 F.3d 206, 208 (5th Cir. 2020).

requires the Court to apply an abuse of discretion standard—rather than *Firestone's* default *de novo* standard—to the plan administrators' factual findings. *Koch*, 425 F. Supp. 3d at 747.

"When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion." *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 247 (5th Cir. 2018) (citing *Firestone*, 489 U.S. at 115). However, when a plan does not include a valid delegation clause, "the Supreme Court has held that 'a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard.'" *Id.* (citing *Firestone*, 489 U.S. at 115). "In 2011, Texas enacted legislation that banned discretionary clauses in . . . policies including those for 'accident or health insurance.'" *Woods v. Riverbend Country Club*, 320 F. Supp. 3d 901, 908 (S.D. Tex. 2018) (citing Tex. Ins. Code §§ 1701.062(a), 1701.002). Though an open question exists as to whether ERISA preempts Texas law, the Fifth Circuit declined to answer the question. *See Ariana M.*, 884 F.3d at 248. Other district court cases have noted that Texas implemented its ban on insurance-plan discretionary clauses as a reaction to *Firestone*. *See, e.g.*, *Koch*, 425 F. Supp. 3d at 748 (citing *Pike*, 368 F. Supp. 3d at 1024 n.2).

Here, neither party deeply analyzes the open question of whether ERISA preempts Texas law.[73] So, based on the Fifth Circuit's analysis in *Ariana M.* and applications by district courts in *Koch* and *Pike*, the Court concludes that the Texas Insurance Code prevents the application of the

---

[73] Plaintiff initially asserted—to her own disadvantage—that the Court should follow an abuse of discretion standard. *See* Pl.'s Br. 19–21, ECF No. 41. Perhaps realizing her original error, Plaintiff now asserts that the Court should engage in a *de novo* review because "MetLife refused to engage with the terms of the contract." *See* Pl.'s Reply 1, ECF No. 50. Defendant, meanwhile, offers case law and legal reasoning under both a *de novo* and abuse of discretion standard and asserts that they should win under either standard. *See* Def.'s Cross-Motion 8–10, ECF No. 48. Notwithstanding Plaintiff's conflicting positions on this point, the Court is bound by the applicable law and not the opinions of the parties. *United States v. D'Luna-Mendez*, No. SA-22-CR-00367, slip op. at 3 (W.D. Tex. July 13, 2023) (noting district courts are "bound by Fifth Circuit precedent").

Plan's discretionary clause. Accordingly, the Court conducts a *de novo* review of both the law and facts.[74]

### III. ANALYSIS

Having resolved the issues regarding the proper procedural vehicle and standard of review, the Court finally reaches the merits: Does the administrative record support Mrs. Wicks' claim that an "accidental injury" was the "Direct and Sole Cause" of Mr. Wicks' death?

A court must "in a *de novo* review, independently weigh the facts and opinions in the administrative record to determine whether the claimant has met [her] burden . . . within the meaning of the policy." *Pike*, 368 F. Supp. 3d at 1030 (internal citations omitted) (noting that the Fifth Circuit has not yet provided guidance regarding a district court's *de novo* review in ERISA cases). The administrator's decision to deny benefits "is not afforded deference or a presumption of correctness." *Id.* "A district court's review, however, is not open-ended; the court is confined to the terms of the Plan and the evidence included in the administrative record." *Koch*, 425 F. Supp. 3d at 750. Limiting relief to that which "will enforce '*the terms of the plan*' or the statute, [29 U.S.C.] § 1132(a)(3) (emphasis added) . . . reflects ERISA's principal function: to protect contractually defined benefits." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013) (internal citations omitted). "The statutory scheme . . . is built around reliance on the face of written plan documents. Every employee benefit plan shall be established and maintained pursuant to a written instrument, and an administrator must act in accordance with the documents and instruments governing the plan insofar as they accord with the statute." *Id.* at 100–01 (internal citations and

---

[74] Since the Court ultimately affirms MetLife's decision under a *de novo* standard of review, then *a fortiori* the Court would also affirm MetLife's decision under an abuse of discretion standard of review. As such, the Court's final disposition would be the same regardless of the applicable standard of review.

quotations omitted). As the Supreme Court has stated, "The plan, in short, is at the center of ERISA." *Id.* at 101.

Mrs. Wicks claims that her husband died as the result of an accidental injury, but correctly notes that the Plan does not define "accident."[75] As other courts have recognized, defining "accident" is "not as simple as it might first appear." *Carson v. Metro. Life Ins. Co.*, 72 F. Supp. 2d 725, 728 (W.D. Tex. 1999); *see also Brenneman v. St. Paul Fire & Marine Ins. Co.*, 411 Pa. 409, 412 (1963) ("Everyone knows what an accident is until the word comes up in court.").

However, here, the Court need not define accident for two reasons. First, the Fifth Circuit has categorized morbid obesity as a preexisting infirmity and stated that deaths occurring from "standard complications of standard medical treatment" stem from disease, not accident. *Thomas v. AIG Life Ins. Co.*, 244 F.3d 368, 369–70 (5th Cir. 2001). Second, in *Koch*, this Court resolved a similar case involving the exact same "Direct and Sole Cause" clause from MetLife on grounds other than the meaning of "accident." *Koch*, 425 F. Supp. 3d at 744, 751.

First, in *Thomas*, the Fifth Circuit found that obesity treatment-related deaths stem from the preexisting infirmity of obesity rather than from an accident—provided there was proper medical treatment. 244 F.3d at 370. There, the decedent "suffered from morbid obesity" and "had two stomach stapling surgeries to treat this disease." *Id.* at 369. The decedent died from sepsis after his sutures broke, and the plaintiff filed for benefits claiming that the decedent's "death was caused by an accident that took place during his operation." *Id.* The Fifth Circuit disagreed and adopted the Seventh Circuit's analysis in *Senkier* where the patient's death resulted from underlying illness, not accident, because it "occurred 'from the standard complications of standard medical treatment' for a disease." *Id.* at 369–70 (citing *Senkier v. Hartford Life & Accident Ins. Co.*, 948 F.2d 1050,

---

[75] Pl.'s Br. 10, ECF No. 41.

1053 (7th Cir. 1991)). The *Senkier* court found that "[w]hen the death results . . . because proper medical treatment is unsuccessful, the death is caused by the preexisting infirmity." *Id.* at 370. So, the Fifth Circuit found "no principled basis on which to disassociate [the decedent's] injury from the disease complications of his obesity. As in *Senkier*, [the decedent's] death was the foreseeable result of treatment for his disease." *Id.*

Second, in *Koch*, this Court found that the determinative question in a similar contract involving the same MetLife Direct and Sole Cause clause hinged on whether the claimed accident was the Direct and Sole Cause of the decedent's death. *Koch*, 425 F. Supp. 3d at 744, 751. This Court presumed, for the sake of argument, that the decedent died in a covered accident. *Id.* at 751. This Court then stated that "[t]he question is whether [the decedent's widow] has met her burden of proving that the presumed accident was the "[d]irect and [s]ole [c]ause" of [decedent's] death." *Id.* In determining whether that plaintiff met her burden, this Court found that "the administrative record contains evidence pointing both directions—some records suggest that the fall caused [decedent's] death, while others suggest [decedent] died of a heart attack." *Id.* So, this Court affirmed MetLife's denial of benefits because the plaintiff could not "point to a single piece of evidence in the administrative record that proves the fall was the *sole* cause." *Id.*

Here, Plaintiff's claimed accident also is not the Direct and Sole Cause of Mr. Wicks' death based on the reasoning in *Thomas* and *Koch*. First, Mr. Wicks died from standard complications of standard medical treatments. Second, Mr. Wicks received proper medical treatment and Plaintiff cannot point to a single piece of evidence in the administrative record that proves that Dilaudid was the sole cause of Mr. Wicks' death. Because Plaintiff has not met her burden of proving that a drug overdose was the Direct and Sole Cause of Mr. Wicks' death, this Court need not address Plaintiff's claim that the Drug Exclusion works as an exception to the Illness/Treatment Exclusion.

First, Mr. Wicks' death from post-surgical pain medication falls under the umbrella of "standard complications of standard medical treatment" for a disease. *Thomas*, 244 F.3d at 370. In both *Thomas* and the present case, the decedent underwent surgery to treat morbid obesity and died shortly thereafter. *Id.* at 369. In *Thomas*, sepsis resulting from busted stomach staples was considered "standard complications of standard medical treatment." *Id.* Likewise, here, despite their disagreements on the proper drugs and dosages, both parties agree as a general matter that Mr. Wicks required pain medication after his surgery. Accordingly, the Court finds that Mr. Wicks' death resulted from standard complications (a negative reaction to pain medication) of standard medical treatment (a gastric sleeve surgery).

Second, Mr. Wicks received proper medical treatment because the uncontroverted record shows that Plaintiff received an appropriate dose of Dilaudid. Although Plaintiff correctly contends that the Death Certificate lists the Underlying Cause of Mr. Wicks' death as an "Unintentional Narcotic Overdose," Plaintiff fails to proffer evidence showing that the Hospital negligently administered Dilaudid or that a Dilaudid overdose was the Direct and Sole Cause of Mr. Wicks' death. Crucially, the use of the word "overdose" does not necessarily imply negligence. True, "overdose" can mean the decedent received a negligently excessive amount of a drug. But "overdose" can also mean that the decedent received a normal, medically appropriate amount of a drug that nonetheless proved unforeseeably dangerous due to the patient's unique physiology.

Plaintiff agrees. In her summary judgment brief, Plaintiff writes that:

> MetLife even goes so far as to admit the drug was used as per the doctors' orders and that it was appropriate: 'The decedent received an appropriate dose of medication[.]' (Wicks AR 01232)[.] Clearly, since Mr. Wicks died[,] the dose was too much for this particular patient, even if it was done following the doctor's prescription.[76]

---

[76] Pl.'s Br. 14, ECF No. 41.

Plaintiff provides no competent expert testimony showing that the doctor inappropriately prescribed an excessive amount of Dilaudid or that the nurses failed to follow the prescription.

On the contrary, the uncontroverted record shows that Mr. Wicks received an appropriate amount of Dilaudid. Dr. Darracq, the independent medical expert retained by Defendant, wrote that "[t]he dose of Dilaudid administered was an appropriate and accepted dose for pain relief following surgery." He also stated that he could not conclude with a reasonable degree of medical certainty that an administered drug overdose caused Mr. Wicks' death. Additionally, Dr. Darracq wrote that "the timing was not that which would be expected with opioid related death."[77] Dr. Darracq also stated that Mr. Wicks "had the physical illness of obesity."[78] He further remarked, "In the absence of this condition and the surgery that was performed to correct it, the decedent would not have received postoperative medications that may have been contributory to death. Therefore, the loss was contributed to by the physical illness of obesity and the surgical treatment of same."[79]

Furthermore, the work product of the other doctors mentioned by Plaintiff—Dr. Belott, Dr. Pavelek, Dr. Zheng, and Dr. Radelat—does not controvert this testimony. First, the record only shows that Dr. Belott prescribed the medication. So, evidence related to Dr. Belott does not controvert the record.

Second, the record only shows that Dr. Pavelek prepared the Death Certificate. The Death Certificate listed "Unintentional Narcotic Overdose" as the Underlying Cause, "Morbid Obesity" as a "Significant Condition Contributing," and the Manner of Death as "Natural."[80] As discussed above, the classification of Mr. Wicks' death as an "Unintentional Narcotic Overdose" does not

---

[77] A.R. at 1232, ECF No. 42.
[78] A.R. at 1232, ECF No. 42.
[79] A.R. at 1232, ECF No. 42.
[80] "The conclusory Manners of Death noted in Death Certificates are not necessarily dispositive as to AD&D coverage because the terms may not be used within the meaning and limitations contemplated by the ERISA plan. The terms of the plan control." Def.'s Cross-Motion 11 n.3, ECF No. 48.

prove that he received improper medical treatment because overdose can mean that the individual patient could not handle a normally appropriate dosage. So, evidence related to Dr. Pavelek does not controvert the record.

Finally, the record only shows that Drs. Zheng and Radelat confirmed parts of the Death Certificate without speaking to the appropriateness of the medical treatment. Dr. Zheng's one-page report only quotes, in relevant part, how Dr. Pavelek documented Mr. Wicks' death on the Death Certificate. Zheng wrote, "His cause of death was documented as an unintentional narcotic overdose, causing gastric aspiration, cardiac arrest, and anoxic brain injury." [81] Additionally, Dr. Radelat's autopsy report only listed Mr. Wicks' cause of death as an anoxic episode and did not even speak to the underlying cause. So, evidence related to Drs. Zheng and Radelat does not controvert the record. Thus, the record is uncontroverted among the medical experts.

Therefore, because the record shows that Mr. Wicks received an appropriate dosage of Dilaudid, the Court finds that Mr. Wicks received proper medical treatment. Since Mr. Wicks received proper medical treatment, the Court finds that his death was caused by the preexisting infirmity of obesity. Because Mr. Wicks died from obesity, his death did not result from "accidental injury, independent of other causes."[82] As such, an "Unintentional Narcotic Overdose" is not the Direct and Sole Cause of Mr. Wicks' death. Thus, the Court **AFFIRMS** MetLife's denial of benefits.

## IV. CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 40), **DENIES** Defendant MetLife's Cross-Motion for Summary Judgment (ECF No.

---

[81] A.R. at 635, ECF No. 42.
[82] A.R. at 48, 130, ECF No. 42.

47), and **AFFIRMS** MetLife's denial of benefits based on an independent *de novo* review of the administrative record. Final judgment shall issue.

    **SO ORDERED** on this **14th day** of **August, 2023**.

                                                    Reed O'Connor
                                    **UNITED STATES DISTRICT JUDGE**